UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CADY STUDIOS, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>WENDY WILSON CLIFT and<br>WATERBOY GRAPHICS, LLC,<br><br>    Defendants. | CIVIL ACTION NO.<br>1:18-cv-04670-JPB |

## ORDER

The Court held a hearing on Plaintiff Cady Studios, LLC's ("Cady") Motion for Show Cause Order ("Motion"), ECF No. 132, on March 30, 2022, and April 11, 2022. Having fully considered the papers filed in connection with the Motion, the evidence offered at the hearing and the parties' oral arguments, the Court finds as follows:

### I.  BACKGROUND

Cady filed suit against Defendant Wendy Wilson Clift ("Clift") in October 2018, alleging that Clift, who was formerly employed by Cady, violated her non-compete agreement with Cady in the course of her subsequent employment with Impact Media Group ("Impact Media"). According to the Complaint, Cady

provides photography services to schools and specializes in school branding and marketing services associated with schools, scholastic events and yearbook design.

The Court[1] held a preliminary injunction hearing in November 2018, after which it enjoined Clift from "directly or indirectly competing with Cady . . . or becoming engaged in any way in any business which competes with Cady . . . in violation of her Non-Compete Agreement or applicable law" (the "November 2018 Order"). ECF No. 25 at 35. Clift had ceased employment with Impact Media by the time the preliminary injunction hearing occurred, but the Court noted that she was in the process of negotiating employment with Waterboy Graphics, LLC ("Waterboy"). *Id*. at 8. The Court therefore concluded that Cady "would be irreparably harmed if Clift were to be allowed to join another company engaged in the same business and in the same geographic region as Cady . . . and compete for the same business." *Id*. at 33. The Court did not, however, prohibit Clift from working for Waterboy.

Cady thereafter moved the Court to hold Clift in contempt of the November 2018 Order based on actions Clift allegedly took while employed with Waterboy. The Court held a hearing on the contempt motion in April 2019 and found that

---

[1] This matter was previously handled by another judge of this district and was transferred to the undersigned on June 18, 2019.

2

Cady "failed to present clear and convincing evidence that Clift violated the [November 2018] Order." ECF No. 74 at 12. Specifically, the Court ruled that there was "not sufficient evidence that Clift[,] individually or as an employee of Waterboy[,] directly competed or attempted to compete against Cady . . . with regard to its business, including school branding, in any school within the thirty-nine counties covered by the [November 2018] Order." *Id*.

Additionally, the Court clarified that Clift was enjoined from: (i) directly or indirectly competing with Cady within the thirty-nine specified counties in Georgia (the "Excluded Counties"); and (ii) becoming engaged in any way in any business which competes with Cady within the Excluded Counties (the "May 2019 Order"). *Id*. at 21. The Court further stated that Cady's business "includes the provision of school branding to high schools, middle schools, and elementary schools." *Id*. at 22.[2]

Cady added Waterboy to this action as a defendant in September 2019. In part, Cady alleged that Waterboy "continued to employ Clift as a Sales Manager over the Southeast region[,] including Georgia[,] and . . . continued to encourage Clift to solicit branding and/or marketing services from accounts in the [thirty-

---

[2] The November 2018 Order and the May 2019 Order are referred to herein as the "Injunctions."

3

nine] prohibited counties listed in her Non-Compete Agreement." ECF No. 93, ¶ 78.

On February 5, 2020, Clift and Waterboy (collectively "Defendants") moved to dissolve the Injunctions, and the Court granted the motion on July 23, 2020. While the motion to dissolve was pending, however, Cady filed the instant Motion, alleging that Clift continuously violated the Injunctions from November 2018 through 2020 and that Waterboy knowingly enabled such violations. ECF No. 132 at 4-5.

Clift has since settled Cady's claims against her and was dismissed from the case in February 2021.[3] Waterboy is therefore the only remaining defendant.

Over the course of the two-day hearing on Cady's Motion, the Court heard evidence that while the Injunctions were in effect, Waterboy and Clift provided branding services to schools in the Excluded Counties, pursuant to agreements Waterboy had with Lifetouch, one of Cady's competitors, and BSN, a sports

---

[3] Clift testified as a key witness for Cady during the hearing on Cady's Motion. Waterboy challenged Clift's credibility because she has now apparently changed certain of her previous positions. On cross-examination, Clift testified that Cady's counsel drafted the declaration she submitted on behalf of Cady, and she made no changes to it. Clift further testified that at the time, she "mentally" needed to get "out of" the litigation and the industry and "just move on with [her] life." The Court acknowledges that there are questions regarding Clift's credibility and does not credit her testimony where there is reliable contrary evidence.

4

equipment company. Like Cady, Lifetouch sells photography services to schools and provides branding services as an incentive to secure photography sales. BSN, on the other hand, sells sports equipment to schools but similarly uses branding services to support the sale of its products. The record is clear that Lifetouch competes directly with Cady, but it is not clear whether BSN competes with Cady, either directly or indirectly.

Cady's branding services are provided by an in-house team, whereas Lifetouch and BSN outsource their branding services to third-party vendors such as Waterboy. These vendors provide branding services directly to the schools under an addendum to Lifetouch's and BSN's contract with the schools. Lifetouch and BSN pay the vendors directly for the services.

In addition to providing branding services to schools in the Excluded Counties, Clift used her relationships with school officials in the Excluded Counties on multiple occasions to help Lifetouch maintain its photography contracts with those schools. For example, Clift testified that she accompanied a Lifetouch representative to East Coweta High School, which is located in one of the Excluded Counties, to help "save" Lifetouch's photography contract that it was in danger of losing. Clift also testified that, at Lifetouch's request, she helped the

company "secure and retain" its contract with Norcross High School, which is also located in one of the Excluded Counties.

Clift further testified that Waterboy's principals told her to continue working in the Excluded Counties, in spite of the Court's orders. She identified schools in the Excluded Counties for which she provided branding services, including Wheeler High School, McIntosh High School and Woodstock High School, but clarified that the work was completed in connection with Lifetouch and BSN contracts.

The evidence also showed that Waterboy hired Clift's nanny, Katherine Johnson, who had no prior experience with branding or sales, to serve as Waterboy's branding sales representative in Georgia. Clift performed sales activity behind the scenes within the Excluded Counties in conjunction with Johnson and then received commissions on Johnson's sales. Waterboy ultimately clawed back the commissions paid to Clift for Johnson's sales, but the claw back did not occur until around the time Waterboy was preparing to respond to Cady's Motion for contempt.

In response to this evidence, Waterboy's principals testified that they believed that completing branding services for Lifetouch and BSN was acceptable under the Injunctions because those clients were corporate customers, not schools.

In other words, they believed that work completed for Lifetouch and BSN did not constitute competition with Cady because Cady provided branding services only to schools.

Waterboy's principals further explained that they provided services to the schools under Lifetouch's and BSN's contract addendums with the schools, which were entered *after* the companies had already executed photography or sports equipment contracts (as applicable) with the schools.  In the view of Waterboy's principals, any opportunity Cady had to serve those schools was extinguished at that point.

Waterboy's principals further testified that nine of the contracts to provide branding services in schools in the Excluded Counties predated the Injunctions and argued that the Court was aware of such contracts prior to issuing the Injunctions and specifically permitted Waterboy to continue providing services under them. Waterboy's principals also pointed out that fifteen of the contracts Cady identified as violative of the Injunctions were executed between the dates of the November 2018 Order and the May 2019 Order and that all of those contracts were with BSN or Lifetouch.  Only two contracts were executed after the May 2019 Order, and those contracts were with BSN.

7

The evidence also showed that Waterboy took some steps toward complying with the Injunctions. For example, Clift testified that she primarily worked on BSN contracts after the November 2018 Order was entered and any work she completed on Lifetouch contracts would have been "indirect." Further, Waterboy's principals testified that they directed Clift to cease direct sales efforts to schools in the Excluded Counties after the May 2019 Order was entered. They also stated that they placed a map of the Excluded Counties in Waterboy's offices and instructed administrative employees not to refer leads for work in the Excluded Counties to Clift. Waterboy's principals explained that they continued to provide branding services to schools in the Excluded Counties only pursuant to contracts with Lifetouch and BSN.

Waterboy's principals also testified that their company is a small family business that had never been involved in litigation, and they relied on the advice of counsel regarding the interpretation of the Injunctions. One of the attorneys, Charles Dalziel ("Dalziel"), represented Clift in this litigation and was never retained by Waterboy. The other attorney, Barton Black ("Black"), replaced Dalziel as Clift's attorney. Waterboy later retained Black between June 2019 and September 2020 to represent it in this action.

Waterboy's principals contended that Dalziel advised Clift and Waterboy that the November 2018 Order did not prohibit Clift's work with BSN or Lifetouch and that Dalziel never suggested that Waterboy would violate the Injunctions by providing services for these clients in the Excluded Counties. Waterboy's principals further claimed that Black advised them that the Injunctions permitted Waterboy to complete work for corporate clients.

Cady, however, offered an email from Dalziel that advised only that work for BSN did not constitute competition with Cady. Black testified that he could not recall rendering advice on the topic of Waterboy's provision of branding services to schools in the Excluded Counties under a Lifetouch or BSN contract.[4]

Finally, Waterboy's principals explained that they, themselves, interpreted the Injunctions as not prohibiting work for corporate clients such as Lifetouch and BSN because Waterboy provided those services in the capacity of a third-party vendor under the companies' existing photography contracts with the respective schools.

## II.   ANALYSIS

Injunctions are enforced through the trial court's civil contempt power.

---

[4] The Court notes that Waterboy's principals were not credible on several topics, including the advice provided to them regarding the scope of the Injunctions.

9

*See Reynolds v. Roberts*, 207 F.3d 1288, 1298 (11th Cir. 2000).  Upon a finding of contempt, an order imposing sanctions "can be either coercive, which is intended to make the recalcitrant party comply, or compensatory, which reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance."  *Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534 (11th Cir. 1986) (citation and punctuation omitted); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (stating that civil contempt "is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance").

The party seeking a contempt order "has the initial burden in a civil-contempt case to clearly and convincingly show the district court that (1) the injunction was valid and lawful; (2) the order was clear, definite, and unambiguous; and (3) the contempt defendant had the ability to comply with the order (but did not do so)."  *Fed. Trade Comm'n v. Nat'l Urological Grp., Inc.*, 786 F. App'x 947, 954 (11th Cir. 2019).  Once the party establishes the *prima facie* case, "the burden shifts to the defendant[] to explain [its] noncompliance."  *Id*.

It is well-settled that "[t]he absence of wilfulness does not relieve [a party]

10

from civil contempt." *McComb*, 336 U.S. at 191.

> [T]he focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue.  Still, substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance.

*PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1212–13 (11th Cir. 2019) (citations and punctuation omitted, alteration in original); *see also Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990) (same).

Notwithstanding this allowance, a defendant who believes that the injunction is burdensome in operation or is ambiguous in some way must petition the court for relief.  It cannot stay silent regarding the purported issue until it is faced with contempt proceedings.  *See McComb*, 336 U.S. at 192 (noting that the claimed extenuating circumstances did not excuse performance because the defendants "could have petitioned the [d]istrict [c]ourt for a modification, clarification or construction of the order"); *Nat'l Urological Grp.*, 786 F. App'x at 955 (affirming the district court's finding of contempt because the defendants were "calculating actors who stayed silent concerning the purported ambiguity about which they . . . complain[ed]" and who "deliberately engaged in self-serving activities they knew seriously risked violating the injunction").

Similarly, a defendant is not excused from contempt simply because the

injunction did not specifically enjoin the actions alleged to violate the order. Such a rule would create "tremendous impetus" to disobey the law and would "operate to prevent accountability for persistent contumacy." *McComb*, 336 U.S. at 192. In all, a party subject to an injunction is expected to comply with the order or seek relief, and "[d]istrict courts have broad discretion in fashioning civil contempt sanctions" for noncompliance. *Howard Johnson*, 892 F.2d at 1519.

When compliance with an order is no longer an issue (for example, if the injunction has expired), the remedy is compensatory, and the goal is reimbursement for "'losses flowing from noncompliance and expenses reasonably and necessarily incurred in the attempt to enforce compliance.'" *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 458-59 (11th Cir. 1984) (citation omitted); *see also Sizzler*, 793 F.2d at 1534–35 (noting the "sensible as well as binding" rule that reimbursement to a prevailing movant include reasonable expenses of enforcement). Reimbursement can include attorneys' fees and costs, which may exceed the amount awarded in compensatory damages. *See PlayNation*, 939 F.3d at 1215 (affirming an attorneys' fees award of $46,465.25 for civil contempt where compensatory damages totaled only $1,500).

Here, Waterboy does not dispute that the Injunctions were valid and lawful or that it had the ability to comply with them. Thus, the issues for the Court to

decide are whether the Injunctions were ambiguous and whether Waterboy violated them.

The Court is not persuaded by Waterboy's argument that the Injunctions were ambiguous.  Any claimed ambiguity in the November 2018 Order was remedied in the May 2019 Order, in which the Court expressly stated that "the business of Cady . . . includes the provision of school branding to high schools, middle schools, and elementary schools."  ECF No. 74 at 22.  By the plain words of that Order, Clift was prohibited from engaging in any activity in the Excluded Counties that competed with Cady's business, including branding services.  The Court disagrees that the Order was ambiguous simply because it did not specify whether branding services provided under a third-party contract with a corporate client constituted competition with Cady.

Rather, the Court finds that the language prohibiting direct and indirect competition with Cady was sufficient to put Defendants on notice that competition against Cady, whether through direct branding sales to schools or through some other indirect method, was prohibited.  And if Waterboy really believed that the Order was ambiguous regarding third-party branding services, it could have sought clarity from the Court.  It did not.  Waterboy cannot now rely on a purported ambiguity in the Injunctions as a defense after it willfully engaged in activities that

it, at the very least, suspected would violate the Injunctions. *See McComb*, 336 U.S. at 192; *Nat'l Urological Grp.*, 786 F. App'x at 955.

Moreover, regardless of whether the Injunctions were silent on Clift's ability to provide branding services to corporate clients, whether it was reasonable to interpret the Injunctions as allowing such services or whether it was appropriate for Waterboy to rely on the advice of counsel that such services were permitted, Cady established that Waterboy and Clift did more than just provide third-party branding services to corporate clients during the term of the Injunctions. For example, with respect to East Coweta High School, Clift accompanied a Lifetouch representative on a sales call to the school to help "save" Lifetouch's photography contract with the school. Likewise, Clift helped Lifetouch "secure and retain" a contract with Norcross High School. These actions constituted direct competition with Cady because they went well beyond simply completing outsourced branding work for Lifetouch and presumably foreclosed Cady's opportunity to secure photography contracts with those schools.

Additionally, the Court is not persuaded by Waterboy's argument that it took substantial steps towards compliance such that any violation of the Injunctions should be excused. The Court acknowledges that Waterboy instructed Clift to cease direct sales efforts to schools in the Excluded Counties after the May 2019

Order was entered and instructed its administrative employees not to refer leads for work in the Excluded Counties to Clift. However, those efforts are significantly outweighed by Clift and Waterboy's other willful actions to provide branding services for schools in the Excluded Counties and to help Lifetouch secure photography contracts. Such actions undermine Waterboy's argument that it undertook a good-faith effort to comply with the Injunctions.

The Court also disagrees with Waterboy's contention that a finding of contempt is not warranted here because the Court previously declined to hold Clift in contempt for her work with Lifetouch. The May 2019 Order found only that Cady failed to provide clear and convincing evidence that Clift competed against Cady with respect to a specific Fayette County High School branding project. The Court explained that it was "reasonable to assume that if Waterboy was doing business in Fayette County High School in conjunction with Lifetouch and it was following the standard business cycle [of the] industry, it would have contracted with Fayette County High School months or years prior to the beginning of the 2018-19 school year." ECF No. 74 at 20. In other words, the Court concluded that Waterboy likely provided branding services to Fayette County High School pursuant to a contract that would have been in place prior to the November 2018 Order and therefore Clift did not violate the Order.

Based on the foregoing analysis, the Court finds Waterboy in contempt of the Injunctions.[5]

The Court, however, finds that Cady has not provided sufficient evidence to support its contention that Waterboy intentionally delayed the production of documents. The record shows that Waterboy's principals were contending with a serious health issue during the discovery period, and Clift, who was Cady's key witness on this issue, conceded that she did not have firsthand knowledge of the allegations regarding the delay. She also stated that she was not certain whether Waterboy instructed its attorney to delay the production of documents.

The Court now turns to the issue of what sanctions should be imposed for Waterboy's contempt.

As an initial matter, the Court notes that Waterboy terminated Clift's employment in April 2020, and the Injunctions expired that same month. Therefore, any sanction the Court imposes at this time will necessarily be compensatory in nature and not coercive. Given that compensatory sanctions are intended to reimburse for losses and expenses incurred due to a defendant's failure

---

[5] The Court is not convinced by Cady's argument that Clift's employment with Waterboy, itself, constituted a violation of the Injunctions. The November 2018 Order contemplated Clift's employment with Waterboy, and the May 2019 Order expressly acknowledged Clift's employment with Waterboy and did not find Clift in contempt of the Court's Order.

to comply with an order, sanctions imposed by the Court must "flow" from Waterboy's noncompliance with the Injunctions and the expenses Cady reasonably and necessarily incurred in its attempt to obtain Waterboy's compliance. *Rickard*, 735 F.2d at 458-59.

Based on this guidance, the Court declines to strike Waterboy's answer and defenses as Cady requests because such a sanction is not sufficiently related to Waterboy's violation of the Injunctions.

For the same reason, the Court declines to award *all* of Cady's attorneys' fees incurred in this case as Cady requests. While the Court agrees that Cady has incurred attorneys' fees and costs in bringing the instant Motion, the Court finds that a request for all attorneys' fees incurred over the life of the case is not supported by the law. For example, Cady's attorneys' fees and costs related to filing the original Complaint against Clift did not "flow" from Waterboy's violation of the Injunctions, which were entered *after* the Complaint was filed.

To assist the Court in determining the appropriate sanctions in this case, Cady is directed to file a brief (with supporting evidence) describing the damages it alleges it suffered as a result of Waterboy's violations of the ***Injunctions***. If Cady seeks lost profits as to a specific school account, its evidence must include facts establishing whether Waterboy serviced the account as a direct sale or pursuant to

17

an addendum agreement with Lifetouch or BSN, when the agreement was executed by Waterboy, Lifetouch or BSN and how Cady was foreclosed from a sales opportunity at that school.  Cady may also include a request for attorneys' fees and costs, but such fees and costs must be limited to those reasonably incurred in investigating and bringing this Motion.

The Court intends to hold a hearing on sanctions on June 7, 2022. Accordingly, the Court directs Cady to file its damages brief by May 26, 2022, and Waterboy to respond by June 2, 2022.  The parties may jointly propose an alternate briefing and hearing schedule.

**SO ORDERED** this 16th day of May, 2022.

_____
J. P. BOULEE
United States District Judge